321 So.2d 734

**Leo RAYFORD**

v.

**STATE.**

**6 Div. 663.**

Court of Criminal Appeals of Alabama.

Oct. 1, 1975.

Rehearing Denied Oct. 21, 1975.

Jackson & Sikes, and John W. Kelly, III, Selma and Joel L. Sogol, Asst. Public Defender, Tuscaloosa, for appellant.

**396**

William J. Baxley, Atty. Gen., and Gary R. Maxwell, Asst. Atty. Gen., for the State.

CLARK, Supernumerary Circuit Judge.

Early in the afternoon of June 7, 1973, an armed robbery occurred in an A & P store, in the city of Tuscaloosa, during which the assistant manager, Ferrell Cork, was killed. Appellant was tried for his murder, convicted of murder in the first degree and sentenced to imprisonment in the penitentiary for life.

The State called as witnesses several persons in the store when the robbery and killing occurred. It was a "super" store with four cash registers. The size of the store, the varied locations of the witnesses, the separate activities of the two robbers in different parts of the store at the same time, the physical arrangements of the inside of the store and other circumstances precluded each witness from having a comprehensive view of the entire occurrence. The testimony of the witnesses as a whole shows beyond serious question and without dispute that two "black males," each armed with a pistol, entered the store; one told an employee of A & P to move aside and proceeded to take money from three of the

cash registers and put the money in his pockets. The other at gunpoint forced the produce manager into the office and ordered him to open the safe; he stated that he could not open it, but that Mr. Cork, who at the time was outside, could do so. When Mr. Cork entered the store, he was ordered by the robber, who had rifled the cash registers, to open the safe, and was shot by him upon Cork's refusal to open the safe. The two struggled with each other; while they were struggling, the robber in the office leaned over a counter and shot in the direction of Cork. The robbers then left the store.

A witness, who was in the cutting room of the store in the back at the time of the robbery, went out the back door after hearing shots and saw a "colored" man run around the side of the store toward an automobile, gold in color and with a black top, being driven by a person whom he could not describe. The automobile left the scene.

A meat cutter at the store, upon returning from lunch at home the day of the robbery and while within three or four blocks of the store, saw an automobile with "brownish gold body" and black top with two "black males" in it come from the direction of the store and run a red traffic light at a fast speed.

One witness in the store during the robbery identified appellant as the man in the office that fired his pistol at Mr. Cork. Other witnesses were unable to identify appellant as a participant, although ten of them had an opportunity to do so at a line-up.

A post-mortem examination of Mr. Cork revealed that deceased had been hit by at least four bullets. There was some indication, according to the examination, of a wound of a fifth bullet, but only four bullets were found in him. All four were 22 caliber. It was determined that two of them were not from a 22 caliber pistol that was introduced in evidence by the State and which is hereinafter discussed, but no determination could be made whether the other two bullets were from such weapon.

At approximately 3:30 the same afternoon, defendant was arrested approximately five miles from Sumiton, Alabama. He and another "black male" were in an automobile being driven at a high rate of speed from the direction of Jasper toward Birmingham on Highway 78. It was pursued by an officer of the Sumiton Police Department in a chase that lasted about five minutes, during which the automobile traveled an estimated speed of between 80 and 90 miles per hour, crossed double yellow lines, went off the traveled portion of the highway through a parking area for one or more filling stations and a restaurant, collided with two trucks and an automobile, went through two ravines, plunged into a ditch and "went up on its nose" along the side of the highway. This was in Jefferson County a short distance from the Walker-Jefferson County line. Appellant, who was driving, and the other occupant immediately abandoned the automobile. Appellant fled from the scene and was chased on foot by Officer J. R. Myers, who had been chasing him in the automobile. Officer Myers ran behind him into the woods a distance of a quarter of a mile, captured him after a struggle and placed him in custody under a charge of reckless driving and illegally crossing a double yellow line. A large crowd assembled in the vicinity of the incident. In the automobile, in plain view on the right front floor board thereof was a 22 caliber pistol with four spent and three unspent cartridges. The pistol was taken into custody by Officer Myers, who delivered his prisoner to Officer Norris, who had taken part in the chase of the automobile, with the direction that appellant be taken to jail at Sumiton, in Walker County. Meanwhile Officer Myers maintained surveillance over the automobile, not allowing it to be touched by anyone. He stayed with the automobile until a wrecker from Sumiton came for it and towed it to Sumiton. Dur-

ing that time the chief of police of Sumiton joined Officer Myers at the scene. After the arrest, a knife, a live 22 cartridge, and nineteen dollars in currency and twenty-six cents "in change" were found in the pockets of appellant.

As the automobile was towed from the scene to the place of business of the "wrecker service" in Sumiton, Chief of Police Walter Allredd went with it. Promptly upon its being released from its tow, in an unenclosed area, the inside of the body of the automobile was examined by Officer Marvin Willcutt in company with Chief Allredd. Exposed to view before any entry into the automobile was the corner of a pillow case under the driver's seat. From within and underneath the pillow case was obtained the total sum of five hundred and forty-four dollars in currency of various denominations. Testimony showed that five hundred and sixty-eight dollars and nineteen cents was missing from the store immediately after the robbery.

Appellant did not testify, but he presented four witnesses who testified in effect that he was in Birmingham at the time of subject crime. The first witness was his mother, who testified he left her home that day at 1:20 P.M. On cross-examination she testified she had had a stroke and "my mind is not good sometimes." Others said they saw him soon after 1:20 P.M. at a pool room in Birmingham; the last one seeing him that afternoon said he last saw him about 2:15. Appellant was then driving an automobile, which, it seems reasonably clear, was the automobile in which he was riding at Sumiton and was the property of another, a close friend of appellant's mother.

There was some discrepancy in the testimony as to the make, style and color of the automobile described by the Tuscaloosa witnesses, but two of them testified that it looked like pictures taken of the automobile which appellant was driving at Sumiton, which had a gold body and a black top.

The alibi testimony furnishes the only conflict with positive, convincing evidence that appellant was a participant in the first degree murder of Ferrell Cork. No serious insistence is made, and we think none can be made, that the time between the crime and the incident at Sumiton was not sufficient for the robbers to have traveled from the one point to the other. The time factor in this respect is in favor of the State rather than defendant, we think. The automobile bore a Jefferson County license tag. It was owned by a friend of appellant's family, who evidently lived in Birmingham. The testimony as a whole warrants the conclusion that an automobile driven by one fleeing from the scene promptly after the robbery and murder and proceeding in a direction that would take it across the Warrior River bridge at Tuscaloosa, with Birmingham as the destination, could be expected to arrive at Sumiton about the time the incident at Sumiton occurred.

It also should be noted that there is a striking similarity in the traveling time between Tuscaloosa and Sumiton via Oakman (which the evidence indicates was the route taken by the automobile) and Jasper and the traveling time from Birmingham to Oakman and return via Jasper to Sumiton. With the traveling time between Birmingham and Tuscaloosa of about an hour, it is to be seen that the alibi witnesses would not have to be more than about an hour off for their testimony to be without any force whatever. Such a difference in time can readily be accounted for as an honest mistake on their part, but whether so or not the jury was not required to believe their testimony, which seems to us of little weight. *Prince v. State,* 50 Ala.App. 368, 279 So.2d 539, cert. denied 291 Ala. 796, 279 So.2d 549; *Chamberlain v. State,* 48 Ala.App. 254, 263 So.2d 709.

■ The main contention of appellant is that there was error in admitting evidence of the finding of the money in the automobile from which appellant fled. He contends that the money was found as a result

of a warrantless search, which he insists was unreasonable, and therefore violative of the Fourth Amendment, for two reasons: (1) that there was an absence of probable cause and (2) that the circumstances were not exigent. No search warrant was issued, but whether there was a "search" within the meaning of the word in the Fourth Amendment is less clear and is more assumed than argued. A determination of any such question is neither called for nor necessary at this time, and we proceed to a consideration of the question of unreasonableness, which constitutes the pivotal difference between the parties.

As to (1), the record shows that, soon after the commission of the crime, radio dispatches were flashed giving details of the crime, including a description of the participants as "two black males," a description of the automobile and the direction it was traveling. The officer who found the money testified he had "heard a general discussion of the whole matter" by "his own people and also over the radio," before he made the examination or search, although he had not heard "anything until after the wreck had occurred." The search was conducted in the presence of the acting chief of police of Sumiton. Before the car was searched the two had discussed the matter. Both had heard of the robbery and had a description of the automobile and of the individuals in it. Both knew of the chase of the automobile, the capture of appellant and the seizure of a pistol in the car.

It is clear that at the time of the search of the automobile, the officer searching it, as well as the chief of police under whose direction the automobile was searched, had probable cause for believing that the last occupants of the automobile were guilty of the robbery, that contents of the body of the automobile would likely constitute important evidence bearing on the crime and that the automobile was a likely depository of at least part, if not all, of the loot, which circumstances justified the search of the automobile insofar as the necessity of probable cause is concerned.

As to (2) above, it is contended that a search warrant should have been obtained before searching the automobile, for that the circumstances were not of such an exigent nature as to justify a search without a warrant.

It would be an understatement to say that we do not suffer from a dearth of authorities on the question of whether the Fourth Amendment to the Constitution of the United States is violated by a warrantless search of an automobile. We believe that appellant does not contend that if the automobile had not been damaged by the wreck, its search under the circumstances here presented, assuming probable cause, would not have been justified.

Appellant counts heavily upon the damaged condition of the motor vehicle to distinguish this case from those cases in which it has been held that the search of an automobile was justified. In other words, appellant insists in effect that for an automobile to come within that classification when the test of reasonableness of its search or seizure is applied, it must be readily automobile (automotive), as well as mobile, at the time it is searched or seized. It is not clear that the car's condition was such that it was not readily mobile, but we will now proceed as if it was not.

In an effort to support appellant on the particular point, he cites cases of the United States Supreme Court that preceded the opinion in *Suggs v. State,* 49 Ala.App. 118, 269 So.2d 136 (1972), in which Judge De-Carlo ably reviewed the opinions in the cited cases. It would needlessly extend this opinion for us to go over all the same ground he has so carefully covered. If we should do so, it would merely be a repetition in substance of what he has said, but lacking its refinement, in giving full consideration to all that the United States Supreme Court had said on the subject at

that time. For the purpose of this case, we think it sufficient to show that the opinion in *Suggs* clearly distinguishes *Preston v. United States*, 376 U.S. 364, 84 S.Ct. 881, 11 L.Ed.2d 777 and *Coolidge v. New Hampshire,* 403 U.S. 443, 91 S.Ct. 2022, 29 L.Ed.2d 564, both relied upon by appellant in this case as well as by appellant in *Suggs.* We adhere to those distinguishing features as set forth in *Suggs* and apply them here. In *Preston, supra,* the charge was vagrancy, to which the search was not related. In *Coolidge, supra,* the search was as to a murder investigation that had occurred several weeks before one search and over a year before two subsequent searches; there was a deliberate and extended investigation, in which there was superabundant time to obtain a search warrant. Indeed, a search warrant was obtained but it was held to be invalid. In addition, in *Coolidge,* the automobile when seized was parked in the driveway of defendant's home and was not then being used for any illegal purpose. Neither *Preston* nor *Coolidge* supports the contention of appellant that the circumstances of this case did not justify the search of the automobile.

In *Suggs, supra,* it was held that where an officer had probable cause to arrest defendant for burglary when he stopped his car during early morning hours, an on-the-spot search would have been permissible, and thus a later search of the impounded vehicle at City Hall was valid. In so holding, *Carroll v. United States, 267* U.S. 132, 45 S.Ct. 280, 69 L.Ed. 543 and *Chambers v. Maroney,* 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 were relied upon, to which the court aptly referred as respectively enunciating and expounding the "principle, 'exigency resulting from mobility.' "

It seems clear that in *Suggs* immediate automobility of the car was not considered as a requisite to its subjection to search, for the automobile, instead of being driven away, was "towed off" from the place of arrest to the City Hall.

We do not doubt that the degree or extent of mobility of the object searched is important and is to be taken into consideration in connection with all the circumstances in arriving at a correct conclusion as to the reasonableness of the search. Its incapacity for immediate movement by its own power could conceivably preclude the reasonableness of a search thereof under some circumstances that would otherwise make the search reasonable, but such impotence does not of itself prevent the application of "the principle of mobility." In the a-borning process of the principle in *Carroll, supra,* it was expressly declared that a "wagon" was to be classified as a vehicle that "can be quickly moved out of the location or jurisdiction in which the warrant must be sought." We think that *Suggs* is ample authority for a disposition of the particular question adverse to appellant. However, since *Suggs,* there have been judicial developments that merit our attention and call for further consideration of the question immediately before us.

In *Cady v. Dombrowski,* 413 U.S. 433, 93 S.Ct. 2523, 37 L.Ed.2d 706 (1973), we have an automobile *disabled* by an accident. Defendant was arrested for drunken driving. The police had exercised a form of control over the automobile; it was towed to a private garage. Defendant, a policeman, was thought to have possessed a revolver; to keep the revolver from falling into the hands of vandals, a warrantless search was made of the automobile. The search failed to reveal the revolver but did lead to the discovery of evidence tending to connect defendant with murder, with which he was subsequently charged and for which he was tried and convicted. The court termed the search a "caretaking" activity as to a vehicle "that was neither in the custody nor on the premises of the owner" and held:

" . . . . Where, as here, the trunk of an automobile, which the officer reasonably believed to contain a gun, was vulnerable to intrusion by vandals, we

hold that the search was not 'unreasonable' within the meaning of the Fourth and Fourteenth Amendments.' "

Four justices dissented.[1] The opinion was followed in *Carey v. Gammons*, 414 U.S. 807, 38 L.Ed.2d 43, 94 S.Ct. 59, in which there was a dissent by one of the justices dissenting in *Cady*.

In *Cardwell v. Lewis*, 417 U.S. 583, 94 S.Ct. 2464, 41 L.Ed.2d 325 (1974), another "towed" automobile had been the object of a "seizure and examination" claimed to be violative of the Fourth and Fourteenth Amendments. Evidence was obtained from paint scrapings from the exterior of the car and a rear tire which tended to connect defendant with an alleged murder. Four of the justices composing the majority in *Cady v. Dombrowski* were of the opinion that there was no violation of defendant's Fourth and Fourteenth Amendment rights; a fifth justice, who concurred in the opinion in *Cady*, concurred in the result in *Cardwell*. The four justices dissenting in *Cady* also dissented in *Cardwell*. In the opinion in *Cardwell* upholding the conduct of the officer as constitutional, it is stated:

"An underlying factor in the Carroll-Chambers line of decisions has been the exigent circumstances that exist in connection with movable vehicles. '[T]he circumstances that furnish probable cause to search a particular auto for particular articles are most often unforeseeable; moreover, the opportunity to search is fleeting since a car is readily movable.' *Chambers v. Maroney*, 399 U.S. at 50–51, 90 S.Ct. 1975, 26 L.Ed.2d 419. This is strikingly true where the automobile's owner is alerted to police intentions and, as a consequence, the motivation to remove evidence from official grasp is heightened.

"There is still another distinguishing factor. 'The search of an automobile is far less intrusive on the rights protected by the Fourth Amendment than the search of one's person or of a building.' *Almeida-Sanchez v. United States*, 413 U.S. 266, 279, 93 S.Ct. 2535, 37 L.Ed.2d 596 (1973) (Powell, J., concurring). One has a lesser expectation of privacy in a motor vehicle because its function is transportation and it seldom serves as one's residence or as the repository of personal effects. A car has little capacity for escaping public scrutiny. It travels public thoroughfares where its occupants and its contents are in plain view. See *People v. Case*, 220 Mich. 379, 388–389, 190 N.W. 289, 292 (1922). 'What a person knowingly exposes to the public, even in his own home or office, is not a subject of Fourth Amendment protection.' *Katz v. United States*, 389 U.S. at 351, 88 S.Ct. 507, 511, 19 L.Ed.2d 576; *United States v. Dionisio*, 410 U.S. at 14, 93 S.Ct. at 771, 35 L.Ed.2d 67. This is not to say that no part of the interior of an automobile has Fourth Amendment protection; the exercise of a desire to be mobile does not, of course, waive one's right to be free of unreasonable government intrusion. *But insofar as Fourth Amendment protection extends to a motor vehicle, it is the right to privacy that is the touchstone of our inquiry.*" [Emphasis supplied][2]

---

1. However, the dissenting opinion found reasons for disagreement that cannot be found in this case. The minority concluded that "there were no exigent circumstances to justify the warrantless search" and stated as the basis for the conclusion, "For even assuming that the officer had reason to believe that respondent's revolver was in the Thunderbird, the police had left the car in the custody of a private garage and did not return to look for the gun until two and one-half hours later." In contrast, is the fact that in this case the automobile was kept under watchful official eye and searched immediately upon its arrival at a suitable place.

2. Applying the emphasized quotation from *Cardwell* in this case, which we do not find necessary to support our views, any right of privacy as to the inside of the body of the automobile is nearer fantasy than fact. Certainly there is nothing sacrosanct about an unlocked automobile in the unenclosed premises of a wrecker service place of busi-

The plurality [3] opinion in *Cardwell* followed the majority opinion in *Cady* in noting that for constitutional purposes there was no difference on the one hand between seizing and holding an automobile before presenting the probable cause issue to a magistrate and on the other hand carrying out an immediate search without a warrant, that "Given probable cause to search, either course is reasonable under the Fourth Amendment."

It is neither necessary nor possible for us to rationalize all of the inconsistencies of judicial expressions on the subject; nor can we reconcile the differences between or among the individual members of the controlling authority, the Supreme Court of the United States, but we are confident that we are not in contravention of any decision of that Court, that we are in accord with the opinions of the appellate courts of this state, and that we are following the course of reason in protecting the rights of the individual and the public—victims as well as criminals—in holding that the constitutional rights of defendant were not violated by the search of the automobile and that evidence of the results thereof was admissible.

Instead of condemning the conduct of the officers involved, we commend them. We have in mind particularly the officer who chased the defendant for a quarter of a mile through the woods, which of itself sheds some light upon the temper of the Sumiton officers on this occasion. Although himself armed, he sacrificed his own safety by capturing the defendant without the effective use of a weapon, a weapon that, as experience has shown, could have been taken away from him and used against him. He gave full measure of devotion to constitutional rights of the individual. He also kept in mind his duty as a law enforcement officer to protect the personal and property rights of the public. He stood guard over the automobile to prevent anyone's inadvertent or intentional stealing or spoiling that which had been stolen, which otherwise someone from the gathering crowd could readily have done. He, the chief of police and Officer Willcutt, who actually searched the automobile and found the money, knew, or should have known, that the most likely place for the money that had been stolen at the time of the robbery and murder of Mr. Cork was in the automobile that was abandoned. They knew or should have known that every few minutes of passing time increased the hazard of the money's being stolen again by criminals working with the participants in the robbery or on their own, knowing full well that "[W]heresoever the carcass is, there will the eagles be gathered together." If the car had not been searched as it was, if time had been taken to procure a search warrant—and considerable time is necessary to obtain a search warrant in the observance of all legal requirements—the result could have been a disposition or handling of the money in a way that would have prevented its restoration to the owner or broken the link connecting it with the defendant and the robbery and murder, or cast suspicion upon innocent persons, including the officers as to the money in the car. In such an event, the officers now criticized for not obtain-

---

ness along a Highway. On the question of the violation of a right of privacy in a portion of U.S.Anno. "Validity, Under Federal Constitution of Warrantless Search of Automobile—Supreme Court cases," 26 L.Ed.2d beginning at page 893, it is reasoned in Footnote 4 that a distinction should be drawn between "a search of concealed parts of an automobile which would normally be considered private, such as the trunk or glove compartment" and a search of "those parts of an automobile which might be deemed to be in plain view." We suggest also that an entry into the body of an unlocked automobile for any purpose other than a criminal one is not comparable to, and certainly cannot be equated with, an entry into a locked automobile or into the closed trunk or glove compartment thereof, which is not involved here.

3. It is so designated in the dissenting opinion.

ing a search warrant would not have been faithful to the trust reposed in them.

Under all the circumstances, justification for the warrantless search in this case is to be found in the fifth of "at least six exceptions under which warrantless searches have been held valid" helpfully listed and discussed by Mr. Justice Bloodworth in *Daniels v. State*, 290 Ala. 316, 276 So.2d 441 (1973). He summarizes the fifth exception as follows:

> "(5) Where 'exigent circumstances' exist coincidental with 'probable cause' (as in the case of movables), see *Chambers v. Maroney*, 399 U.S. 42, 90 S.Ct. 1975, 26 L.Ed.2d 419 (1970) . . ."

The State argues that the search is also justified as constituting a part of an effort to inventory the contents of the automobile, and relies upon *United States v. Boyd*, 436 F.2d 1203 (5th Cir. 1971), wherein the search was held to have been valid as within a justifiable inventory process. We do not find that the Supreme Court of the United States has definitely decided whether the search of an automobile, in a process of taking inventory of its contents, is justified when otherwise it would not be. There is a lack of uniformity in the authorities elsewhere. Somewhat, if not diametrically, opposed to *Boyd, supra*, and *United States v. Kelehar*, 470 F.2d 176 (5th Cir. 1972) is *United States v. Lawson*, 487 F.2d 468, (8th Cir. 1973), in which the court said:

> " . . . nor do we wish to create an exception for what might be called 'searches incident to police custody and control.' If such an exception is to be created, we feel that it should be done by the Supreme Court. In so holding, we do not formulate a rule that every inventory search is per se unreasonable. . . ."

The suggested additional exception is not found in *Daniels, supra*, but it is made clear therein that the six exceptions listed are not necessarily all-inclusive. A correct decision herein on the subject is not dependent upon an additional exception, and we do not attempt the creation of one. However, we know of no commonly possessed valuables, if any, that are more worthy than money of accurate and careful inventory, and especially so under the circumstances of the search in this case.

■ The only other insistence of appellant on reversible error is directed to an occurrence during recross-examination of one of defendant's alibi witnesses. On redirect examination he had testified that he learned of the crime in Tuscaloosa "on the news that night on T. V., when he got off." Promptly thereafter counsel for the State questioned him intensively as to details of the television news program, which program he said he had witnessed. Upon answering that he did not know who the commentator was, that he could not remember "all that" was said, the following occurred:

"Q Did they say that Leo Rayford was in the Tuscaloosa County Jail?

"A I don't remember the exact words that they said.

"Q Did they say Leo Rayford was in custody?

"A (No audible answer)

"MR. LACKEY: Excuse me. Judge, should I warn him or should Your Honor warn him?

"THE COURT: I think we'll remove the jury from the room for a few minutes. Mr. Clements, if you'll take the jury out of the room.

"MR. LACKEY: 'Advise' was the word I intended to say, Judge. Excuse me.

"(The jury was removed from the Courtroom and the following occurred outside their presence and hearing:)

"MR. BURROUGHS: Your Honor, now since the jury has left the room, may I make an objection?

"THE COURT: Yes, sir.

"MR. BURROUGHS: I object to Mr. Lackey's use of the words, shall he 'warn' him, or shall you 'warn' him in the presence of the jury. We move for a mistrial.

"MR. LACKEY: Of course, if the Court please, I tried to say in their presence that I intended to use the word, 'advise', not 'warn'. Of course we have heard 'Miranda warning', 'Miranda warning', 'Miranda warning', and all this sort of thing. It just gets to be part of the usual courtroom conversation. I did not intend to infringe on his rights nor to infringe on the Defendant's rights. The word I intended the connotation of was to. advise him of his rights as to the possibility of perjury in case he knowingly makes a misstatement about a material fact, and any facts having to do with where the Defendant was, if it was someplace else, based on an incorrect statement would be, in my judgment, material.

"MR. BURROUGHS: In fact, he did use the word, 'warn', Your Honor, and you say, 'Well, we'll do it outside the presence of the jury.', and the jury was getting up to leave was when Mr. Lackey jumped up and said, I meant to say 'advise'.

"THE COURT: Well, you may take that up with the Court of Criminal Appeals of the State of Alabama.

"MR. BURROUGH: Are you overruling my objection, sir?

"THE COURT: Yes, sir.

"MR. BURROUGHS: Are you overruling my motion for a mistrial?

"THE COURT: Yes, sir.

"MR. BURROUGHS: All right. We except of course."

Promptly thereafter, out of the presence of the jury, the trial judge stated that he didn't see where there had been any harm done at all. He then addressed remarks to the witness, which, instead of being construed as a warning bordering on intimidation, was in the nature of advice for the protection of the witness, given in as fair and as considerate a manner as possible, it seems to us. He was given an opportunity, which he took, to consult with an attorney for further advice and protection. Upon the return of the jury to the courtroom, the trial court stated:

"THE COURT: Before your short recess a question of law was directed to the Court, and as I told you in the beginning the trial of the case is divided into two parts, one of law and one of facts, and that you are the ultimate decider of the facts and the Court must decide the law. I didn't want you to think that because the Court was removing the Jury that anybody had a conspiracy to keep anything from you. There was just merely a question of law directed to the Court that I had to decide, and that I had to ask you to leave the room, and that was all there was to it. It was a minor, insignificant, procedural matter that had to be cleared up. Now we're ready to continue."

It is argued that the District Attorney "intimidated the witness." We do not think so. His quick substitution of the word "advise" for the word "warn," removed the sting, if any, of the word "warn." Furthermore, the "no audible answer" to the last question propounded to the witness before the incident complained of indicates that the jury probably understood that a warning or advice against inaudible answers, instead of a warning or advice against perjury, was suggested. Worthy of note, also, is the fact that no objection whatever came from defendant at the time of the occurrence before the jury. The only objection made was after the jury retired, which objection was addressed merely to use of the word "warn," which, if objectionable, had been corrected by the substitution of a clearly innocuous

word. Some complaint is now made to the effect that the trial court should have instructed the jury in such a way as to remove any harmful effect of what had occurred. No motion was made that the trial court do so, and after the trial court had informed the jury as to the occasion for its retirement, no complaint was registered by defendant and no request was made for additional instructions by the court. Defendant's objection, out of the presence of the jury to the use of the word "warn" in the presence of the jury, should have been overruled, but a ruling in favor of defendant on the question would of itself have availed defendant nothing. The overruling of defendant's motion for a mistrial was proper, we think. Even if our tendency were otherwise, the action of the trial court was within its discretion in this respect and should not be disturbed. *Shadle v. State*, 280 Ala. 379, 194 So.2d 538; *Edgeworth v. State*, 54 Ala.App. 93, 304 So.2d 911; *Hopkins v. State*, 54 Ala.App. 75, 304 So.2d 629.

Our review of the record pursuant to the provisions of Title 15, Section 389, Code of Alabama 1940 fails to reveal any prejudicial error therein.

The judgment of the trial court should be affirmed.

The foregoing opinion was prepared by Supernumerary Circuit Judge Leigh M. Clark, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby

Affirmed.

All the Judges concur.